IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TYANNA MONTGOMERY,

    Plaintiff,

    v.                                               Civil Action No. PX-17-618

MEDSTAR MONTGOMERY
MEDICAL CENTER,

    Defendant.

******

**MEMORANDUM OPINION**

Pending in this employment discrimination case is Defendant Medstar Montgomery Medical Center's motion for summary judgment. ECF No. 29. Plaintiff Tyanna Montgomery has opposed the motion, and the matter is now ripe for decision. *See* D. Md. Loc. R. 105.2. The Court now rules because no hearing is necessary. *See* D. Md. Loc. R. 105.6. Upon consideration of the parties' briefing and the evidence in the record, the Court GRANTS Medstar's motion.

**I.    BACKGROUND**

Tyanna Montgomery ("Montgomery"), an African-American woman, worked at Medstar Montgomery Medical Center ("Medstar") as a Security Officer from August 2010 until her termination on April 17, 2017. ECF No. 29-2, Dep. Ex. 2; Montgomery Dep. 13:2-7 ECF No. 29-2. Security Officers at Medstar were expected to "effectively resolve confrontation situations," maintain order on the Medstar premises, and assist Medstar visitors and patients. *See* ECF No. 29-2 (Montgomery Dep. 16:14–23); ECF No. 29-2, Dep. Ex. 2.

From 2013 through her termination, Montgomery was supervised by Salvatore Michael Mancuso, a Caucasian male. ECF Nos. 22 at ¶ 40 & 35-1 at ¶ 3. Medstar asserts that

1

Montgomery was terminated for well-documented performance issues, including chronic tardiness and a negative demeanor, while Montgomery argues that she was treated adversely because of her gender, [1] and that her alleged tardiness and poor attitude is pretextual for Medstar's discriminatory treatment and retaliatory termination. The facts that follow are taken from the record and construed in the light most favorable to Montgomery.

  *a.*  *February 2016 – August 2016 Incidents*

On February 24, 2016, Montgomery engaged in a verbal confrontation with a hospital volunteer, Terry Sheetz ("Sheetz"). Montgomery witnessed Sheetz, an elderly white woman, attempting to prevent a visitor from seeing a relative who was a patient at the hospital. ECF No. 29-2 (Montgomery Dep. 43:1–19). Montgomery intervened and escorted the visitor to her relative's room. ECF No. 29-2, Dep. Ex. 6. Sheetz then pointed her finger at Montgomery "in a threatening manner" and yelled at Montgomery that she "better not override [Sheetz's] authority like that again." ECF No. 29-2 (Dep. Ex. 6). Montgomery reported this incident to Human Resources. Sheetz was counseled and apologized for the incident. ECF No. 29-2 (Montgomery Dep. 53:4–23); ECF No. 29-3 at ¶ 2. Medstar's Security Director also met with the hospital's volunteer coordinator to defend Montgomery's actions. ECF No. 29-4 at ¶ 3. Montgomery complained, and continues to argue, that Medstar's Human Resources department failed to accord this incident sufficient attention, and would have disciplined Sheetz more severely had Sheetz been African-American. ECF No. 29-2 (Montgomery Dep. 77:13-78:15). Medstar did not discipline Montgomery at all in connection with this incident. ECF No. 29-2 (Montgomery Dep. 77:13–78:15).

---

[1] Montgomery initially filed claims for both race and gender discrimination. At the summary judgment stage, Montgomery concedes that "she does not meet the necessary requirements to maintain a race discrimination claim." EECF No. 35 at ¶ 5.

2

Shortly after, Montgomery was reprimanded for not greeting visitors in the hospital lobby and, more specifically, failing to greet one of Medstar's Vice-Presidents. ECF No. 29-4 at ¶ 10; ECF No. 29-2 (Montgomery Dep. 78:21–80:20). Montgomery asked Medstar to identify the complaining "hospital VIP," but Human Resources refused to do so. ECF No. 29-2 (Montgomery Dep. 78:21–80:20). As a result of this reprimand, Montgomery was moved from the lobby to a different security desk with less "greeting" responsibilities for one month. She was then returned to her original post in the lobby security station. ECF No. 29-4 at ¶ 12; ECF No. 29-2 (Montgomery Dep. 17:15–18:16); ECF No. 29-2, Dep. Ex. 8.

In April 2016, Medstar implemented a new policy where only Sergeant Security Officers could serve as the "Lead Officer" for each shift, as compared to prior policy which allowed all officers to the lead post. The Lead Officer received increased wages for the shift during which he or she acted in a lead capacity. ECF No. 29-4 at ¶ 15; ECF No. 29-2 (Montgomery Dep. 81:22–25). Montgomery avers that the policy was implemented unevenly because other male non-sergeant officers continued to act as Lead Officer on their shifts. ECF No. 29-2 (Montgomery Dep. 82:1–11); *see also* ECF No. 29-2 (Montgomery Dep. 88:16–89:3). The record demonstrates, however, that Montgomery acted as Lead Officer, and received the increased pay rate, on at least eleven occasions in 2016, including 105.5 total hours of "Lead Officer" pay after the change in policy. *See* ECF No. 29-4 at ¶¶ 20–21.

On or around June 10, 2016, Montgomery expressed to Medstar Vice President of Operations, Kevin Mell, her displeasure regarding how she was treated on the job. Montgomery made no claim that this disfavorable treatment stemmed from her race or gender. ECF No. 29-2 (Montgomery Dep. 104:1–6).

Beginning in July 2016, Montgomery was involved in several incidents with one of her supervisors, George Carr ("Carr") that she believes were motivated by gender bias. In July of 2016, Montgomery accused Carr of removing her "lead pay" time punches from the employee time system. ECF No. 29-2, Dep. Ex. 8. A Human Resources' system audit, however, revealed no such tampering and that Montgomery had been fully compensated for the relevant pay period. ECF No. 29-3 at 10.

On another occasion, Montgomery notes that her suggestion to Carr regarding officer patrols in pairs was met with Carr telling her to "get more heart." ECF No. 29-2 (Montgomery Dep. 96:3–6); ECF No. 29-2, Dep. Ex. 8; ECF No. 29-2, Dep. Ex. 8.[2] Carr also had previously told Montgomery to "grow thicker skin." ECF No. 29-1 at ¶ 64. In a formal complaint filed with Human Resources, Montgomery noted that on another occasion Carr yelled at her, using profanity, in front of a doctor and visitors. ECF No. 29-2, Dep. Ex. 8. Human Resources opened an investigation and, after interviewing a witness identified by Montgomery, could not corroborate her accusations. ECF No. 29-2, Dep. Ex. 9; ECF No. 29-3 at 12.

  b.  *September 2016 Employment Review*

On September 27, 2016, Montgomery received her mid-year employment review which gave her an overall rating of "Below Expectations." ECF No. 29-2, Dep. Ex. 8. Although Montgomery had been previously reprimanded for tardiness and a negative attitude, *see* ECF No. 35-2, she had never received less than the average score of "Key Contributor" during prior performance reviews. Montgomery responded to the September 27 report by filing a letter with Human Resources which detailed the above-described incidents. Montgomery also arranged to meet with her primary supervisor, Mancuso, and other Human Resources representatives, to

---

[2] The deposition has transcribed this phrase as "get more hard," but that is incorrect; Plaintiff states the phrase was "get more heart" in her HR letter and in her Complaint.

4

discuss the incidents and her performance evaluation. ECF No. 29-2, Dep. Ex. 8; ECF No. 29-3 at ¶ 6. At the meeting, Montgomery complained that she was singled out for work and felt harassed because of her gender. ECF No. 29-3 at ¶ 26, Dep. Ex. 2. Mancuso informed Montgomery that the rating of "Below Expectations" was an unintentional oversight, and that Montgomery's score would be corrected to "Key Contributor."[3] ECF No. 29-2, Dep. Ex. 9; ECF No. 29-4 at ¶ 7. The corrected report raised her overall score, but kept unchanged the comments noting Montgomery's chronic tardiness and poor attitude. ECF No. 29-2, Dep. Ex. 13.

  *c. October 2016 – December 2016 Incidents & Investigation*

On October 5, 2016, Montgomery alleges that Carr retaliated against her for her HR report by implementing a policy that prohibited Security Officers from having hair that fell below the shoulders. ECF No. 29-2 (Montgomery Dep. 210:20-211:2). Montgomery again met with Human Resources on October 7, 2016, and was given a copy of her personnel records. Human Resources offered to arrange a meeting with Mancuso to discuss her complaints, which Montgomery refused. ECF No. 29-3 at ¶¶ 34–35, Dep. Ex. 2.

Shortly thereafter, Mancuso confronted Montgomery for not responding to a radio call for assistance. When Mancuso asked Montgomery about the missed radio call, Montgomery informed him that she did not know anything about it, to which Mancuso responded "of course you don't know" and gestured in a way "to promote a stereotype of a black woman . . . bobbing his head." ECF No. 29-2 (Montgomery Dep. 64:17-24); ECF No. 29-3 at 12; ECF No. 29-4 at ¶ 22.

---

[3] "Key Contributor" is equivalent to an average performance score. Medstar employees are assigned one of three ratings, in order from highest to lowest: (1) Role Model; (2) Key Contributor; and (3) Below Expectations. *See* ECF No. 29-2, Dep. Exs. 12 & 13. Even after her score was adjusted, Montgomery scored "Below Expectations" on the "SPIRIT Values" category. ECF No. 29-2, Dep. Ex. 13. She received a 50% score, or "Key Contributor," for the "Technical Duties and Responsibilities" category.

On October 12, 2016, Montgomery filed a complaint with the Equal Employment Opportunity Commission and the Montgomery County, Maryland, Office of Human Rights. ECF No. 22 at ¶ 163. Montgomery does not indicate in her pleadings, nor do the parties provide, the exact claims asserted in Montgomery's EEOC complaint. *See generally* ECF Nos. 22, 29, 35. Montgomery received a right to sue letter from the EEOC on December 13, 2016. ECF No. 22 at ¶ 164. On December 15, Montgomery's car tire was slashed while the vehicle was parked at her home. ECF No. 22 at ¶ 165.

On December 22, 2016, Human Resources concluded its own investigation of Montgomery's complaints, and informed her that it was unable to corroborate any of the alleged incidents. ECF No. 29-3 at 12; *see also* ECF No. 29-2, Dep. Ex. 9; ECF No. 29-3 at 12. The Human Resources Vice President, Victoria Hsai, noted that the department had received Montgomery's EEOC complaint, and in response conveyed to Montgomery that "quite frankly, [Medstar] had extended ourselves in ways that may not have been done with other staff, i.e. other assignments, trying to use her within her strengths." ECF No. 29-3 at 12.

    d.  *"Hold" Patient Incident & Termination*

On February 24, 2017, Mancuso filed written disciplinary action against Montgomery for improperly handling a "hold" patient who had escaped into the hospital's parking lot. ECF No. 29-2, Dep. Ex. 14. The report faulted Montgomery for leaving the scene to call the police department. On March 17, 2017, Montgomery filed a rebuttal to the disciplinary action. ECF No. 29-2, Dep. Ex 19. In it, Montgomery argued that during the "hold" patient incident, Montgomery followed the lead of her senior officer, and his lack of action forced her to notify the local police instead of taking a hands-on approach. ECF No. 29-2, Dep. Ex 19. She also

asserted that the allegation was pretextual and in "retaliation for engaging in a protected activity." ECF No. 29-2, Dep. Ex 19.

During the investigation of this incident, Montgomery forwarded to Human Resources several emails about another, separate "hold" patient incident involving a security officer who called the police without subsequent reprimand. ECF No. 35-2 at 39–41. Human Resources reaffirmed that it had conducted a fact-specific investigation into the February 24 "hold" patient incident and this investigation supported disciplinary action against Montgomery for improperly handling the situation. ECF No. 35-2 at 40.

On April 12, 2017, Mancuso and Hsai met with Montgomery about another incident. Mancuso informed Montgomery that a complaint filed with Medstar asserts that Montgomery had treated a hospital visitor in a "cold" and "not helpful" manner on March 14, 2017. ECF No. 35-1 at ¶ 13. Montgomery requested, but did not receive, proof of the incident. ECF No. 35-1 at ¶ 13. On April 17, 2017, Montgomery was fired for continued violations of Medstar's employment policies and procedures, including her most recent negative treatment of a hospital visitor. ECF No. 29-2, Dep. Ex. 21.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the Court finds the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A court must grant summary judgment where "no genuine dispute as to any material fact" exists as to the pending complaint allegations. *Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013). Importantly, a party opposing summary judgment "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*,

769 F.2d 213, 214 (4th Cir. 1985)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")

**III. DISCUSSION**

    *a.*    *Sex Discrimination Claims (Counts I – IV)*

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000 e–2(a)(1). Because Montgomery has not proffered any direct evidence of discrimination, her claims are subject to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005); *Hawkins v. Pepsi Co, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000); *see also Davenport v. Maryland*, 38 F. Supp. 3d 679, 690 (D. Md. 2014); *Weathersbee v. Baltimore City Fire Dep't*, 970 F. Supp. 2d 418, 430 (D. Md. 2013); *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 482 & n.8 (2007);

Under the *McDonnell Douglas* framework, Montgomery initially must establish a *prima facie* case of discrimination by demonstrating that she is a member of a protected group, and that Medstar took adverse employment action against her in circumstances that give rise to an inference of unlawful discrimination. *See Anderson*, 406 F.3d at 268. If Montgomery establishes this *prima facie* case, the burden shifts to Medstar to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to Montgomery to raise a genuine issue of material fact as to whether the proffered reason is a mere

8

pretext for discrimination. *Id.*; *Holley v. N.C. Dept. of Admin.*, 846 F. Supp. 2d 416, 428–29 (E.D.N.C. 2012).

Although the *McDonnell Douglas* framework "involves a shifting back and forth of the evidentiary burden, Plaintiff, at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of Title VII." *Venugopal*, 334 F. Supp. 2d at 841. "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the non-promotion) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) (internal alterations omitted).

Montgomery argues that she suffered two forms of adverse action: first, discriminatory policy changes and comments about her behavior during her employment; and second, her termination on April 17, 2017. It is beyond dispute that termination is an adverse employment action. As to the many other incidents alleged, however, they do not legally constitute "adverse employment action" under Title VII. An "adverse action" must have some "significant detrimental effect" on the terms and conditions of a person's employment, such as their compensation or potential promotion. *Bailey v. Aress Group. Inc.*, 803 F. Supp. 2d 349, 356 (D. Md. 2011) (citing *Holland*, 487 F.3d at 219). "[A] mere change in an employee's job assignment, even if 'less appealing to the employee . . . does not constitute adverse employment action.' " *James v. Bozz-Allen & Hamilton, Inc.*, 268 F.3d 371, 376 (4th Cir. 2004).

With this standard in mind, the Court finds that Montgomery's transfer from the front desk to the emergency room desk is not an "adverse employment action" as a matter of law. Nor are the changes to employment policies (such as the Lead Officer requirement), which were changes affecting *all* employees, sufficient in themselves to be considered adverse employment action.[4] *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (explaining that "petty slights or minor annoyances that often take place at work" do not amount to adverse employment actions). This is especially so where Montgomery continued to receive Lead Officer assignments with the concomitant pay increase. Likewise, although Montgomery's coworkers may have been rude and abrasive at times, such episodic incidents do not constitute legally adverse employment actions. *Id.*; *see Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 313 (D. Md. 2015) (stating that plaintiff's complaints about "harassment and disrespectful treatment as compared to her male colleagues" took "an impermissibly broad view of the definition of an adverse employment action in a standard Title VII discrimination case."); *Fox v. Leland Volunteer Fire/Rescue Dept., Inc.*, 648 F. App'x 290, 293–94 (4th Cir. 2016) (holding that her coworkers' conduct was "discourteous, insubordinate, and perhaps at times boorish, but not demonstrative of sexual animus"). When viewing the facts most favorably to Montgomery, she has simply not suffered an adverse employment action to sustain her gender discrimination claim.

As to termination from employment, as part of her *prima facie* case, Montgomery must "demonstrate that she was qualified in the sense that she was doing her job well enough to rule out the possibility that she was fired for inadequate job performance, absolute or relative."

---

[4] None of the other policy changes adversely affected Montgomery. Montgomery, for example, does not claim that she was disciplined under the new hair length rule. In fact, she submits no evidence supporting that the hair length rule was an official policy or ever took effect. ECF No. 29-2 (Montgomery Dep. at 214:10–15). Nor did she experience any adverse impact on her shifts because of the "overlap" requirement. ECF No. 29-4 at ¶¶ 23–25.

*Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006). "It is well-established" that job performance is a "valid, non-discriminatory bas[is] for any adverse employment decision." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

Here, Medstar argues that Montgomery was only eliminated after many months of performance problems, including repeated warnings about tardiness, negative demeanor, and failure to perform her job duties. *See, e.g.* ECF No. 29-2, Dep. Ex. 13. For example, in April 2015, Montgomery was late to work no less than ten times, ECF No. 29-2, Dep. Ex. 15, and in June 2016, Montgomery was again reprimanded after reporting late 15 out of 23 work days. ECF No. 29-2, Dep. Ex. 10. Contemporaneous records establish that Montgomery's performance problems continued through her termination in April 2017. *See, e.g.* ECF No. 29-3 at 11–13.

Montgomery, notably, does not dispute that she was chronically tardy. Rather, she asserts that other officers were also late, and emphasizes her other positive work attributes noted in prior work evaluations. ECF No. 29-2 (Montgomery Dep. 122:10-13); ECF No. 35-2. Although Montgomery did receive positive feedback, it coexists with negative comments regarding her tardiness and demeanor. ECF No. 35-2. In addition, Montgomery does not challenge that she had received several reports regarding her failure to assist patients and other Medstar staff. *See* ECF No. 29-2, Dep. Ex. 14; ECF No. 35-1 at ¶ 13; No. 29-2, Dep. Ex. 21; ECF No. 29-2 (Montgomery Dep. 189:2–25).

In this regard, Montgomery has failed to generate a genuine dispute of material fact as to her subpar work performance. Rather the record evidence, when viewed most favorably to her, demonstrates that Montgomery's performance fell short of Medstar's legitimate expectations, which cannot be rebutted by dated and occasional average-to-positive comments on other work

11

attributes. *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 547 (4th Cir.1995) (holding that a past year's performance was irrelevant to a determination of whether plaintiff's performance was satisfactory at the time of termination), *rev'd on other grounds,* 517 U.S. 308 (1996). A "contrary conclusion – that employers could discharge employees only upon a showing of poor job performance – would lead to the nonsensical situation where a perfect employee could get away with any manner of insubordination, regardless of how that misbehavior disrupted the workplace." *Sadeghi v. Inova Health Sys.,* 251 F. Supp. 3d 978, 998 n.17 (E.D. Va. 2017), *aff'd,* 711 F. App'x 174 (4th Cir. 2018). Simply put, Montgomery "cannot create a genuine dispute concerning [a] prima facie case by cherry-picking the record." *Warch,* 435 F.3d at 517–18.

Montgomery also argues that similarly-situated employees outside the protected class were not reprimanded for similar performance problems. She does not, however, dispute that male officers were also disciplined for tardiness and for mishandling "hold" patients. ECF No. 29-2 (Montgomery Dep. 122:14-123:5); ECF No. 36-1 (Montgomery Dep. 161:4–162:5). Nor does Montgomery provide any evidence of disparate treatment aside from her own self-serving testimony. *See* ECF No. 35-1; *Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) (rejecting the plaintiff's testimony as "merely a self-serving opinion that cannot, absent objective corroboration, defeat summary judgment"); *see also Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1995) (affirming summary judgment where the non-moving party offered "self-serving opinions without objective corroboration").

Further, even if Montgomery had established a *prima facie* case of discrimination, summary judgment is nonetheless warranted because Montgomery has not rebutted Medstar's legitimate, nondiscriminatory grounds for terminating her. To defeat summary judgment, an

employee must "offer evidence that the facts supporting the defendant's articulated reasons are untrue," or that the "defendant's proffered reason [for the adverse employment action], although factually supported, was not the actual reason for its decision." *Mengle v. Shady Grove Adventist Hosp.,* No. PX 15-610, 2017 WL 1382320, at *5 (D. Md. Apr. 17, 2017) (quoting *Gbenoba v. Montgomery Cnty. Dep't. of Health and Human Servs.*, 209 F. Supp. 2d 572, 577 (D. Md. 2002)); *see also Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (affirming summary judgment where the record did not support an inference that the employer's explanation was "pretextual").

Aside from her own self-serving testimony, Montgomery does not submit any evidence that defendant's articulated reasons are untrue. Rather, Montgomery broadly asserts in an affidavit that male employees were also late and involved with hold patient incidents and not reprimanded. *See* ECF No. 35-1. Montgomery offers no corroborative evidence for the statements in her affidavit – statements often contradicted by Montgomery's earlier, sworn deposition testimony. *See* ECF Nos. 29-2 (Montgomery Dep. at 79:15–81:12, 122:14–123:5) & 36-2 (Montgomery Dep. at 161:23–162:21). In the absence of any corroborative evidence, Montgomery's affidavit is not sufficient to create a dispute of material fact. *See Williams*, 370 F.3d at 433; *Evans*, 80 F.3d at 962–63.

Importantly, the court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette*, 133 F.3d at 298–299 (internal quotations and citations omitted). The Court's "sole concern" must be that "whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.* (citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–11 (7th Cir. 1997)). Because the uncontroverted record, viewed most favorably to Montgomery, nonetheless shows that she fell below Medstar's

employment standards, the Court finds as a matter of law that Medstar ended Montgomery's employment for legitimate, non-pretexual reasons. Summary judgment is therefore GRANTED as to Montgomery's discrimination claims, Counts I through IV.

  b. *Retaliation Claims (Counts V–X)*

  To make out a *prima facie* case of retaliation, Montgomery must demonstrate that (1) she engaged in protected activity; (2) Medstar took an adverse employment action against her; and (3) a causal link existed between her protected activity and the employment action. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *Louis v. City of Rockville*, No. CV PX-16-1471, 2018 WL 1471681, at *7 (D. Md. Mar. 23, 2018). Employees engaged in protected activity when they "complain to their superiors about suspected violations of Title VII." *Boyer-Liberto*, 786 F.3d at 281 (quoting *Bryant v. Aiekn Re'l Med. Ctrs. inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). "[E]stablishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers v. City of Laurel, Maryland*, No. 17-1237, 2018 WL 3321317, at *11 (4th Cir. 2018).

  As to the first element, Montgomery argues that her June 2016 report, regarding Human Resources' mishandling the incident with volunteer Terry Sheetz, constitutes protected activity. Montgomery concedes, however, that she never identified how Human Resources' actions were animated by impermissible considerations of race or sex. ECF No. 29-2, Dep. Ex. 6; ECF No. 29-2 (Montgomery Dep. 104:3-6). Montgomery's complaint about Human Resources, therefore, is not "protected activity" under Title VII. *See Boyer-Liberto*, 786 F.3d at 281; *see also Burgess v. Brown*, 466 F. App'x 272, 282 (4th Cir. 2012) (noting that "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct.").

Montgomery's September 2016 letter to Human Resources is a different matter. There, Montgomery complained of a number of discriminatory incidents, and as such, the letter was protected activity. *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003) (noting that protected activity includes employees' "right to complain to their superiors about suspected violations of [Title] VII"). Next, the Court must look to whether the "retaliation" alleged by Montgomery after she submitted the September 2016 letter rises to the level of an "adverse employment action."

As noted above, many of the incidents of which Montgomery complains were not adverse employment actions. Although the adverse action in a retaliation action need not affect an employee's "terms or conditions of employment," to qualify, verbal warnings, counseling letters, and formal letters of reprimand are still not considered "adverse employment actions." *See Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011) (citing cases); *see also Burlington Northern & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (noting that verbal and formal reprimands are not adverse employment actions in a retaliation claim). However, Montgomery's termination is undeniably an adverse action, and Montgomery urges this Court to infer that her termination was retaliation for her reporting what she believed was discriminatory treatment. *See* ECF No. 35- at ¶¶ 9–10. In support, she points to the fact that she was terminated only six months after first complaining of discriminatory treatment, and within close proximity to a subsequent March 2017 complaint. *See* ECF No. 29-2, Dep. Ex 19.

"[V]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation]," and "temporal proximity between the protected activity and the employer's adverse action alone will suffice." *Burgess*, 466 F. App'x at 283 (internal quotations and

citations omitted); *see also Strothers*, 2018 WL 3321317, at *11. Here, there is temporal proximity between Montgomery's protected activity and her termination. Accordingly, Montgomery has stated a *prima facie* case for retaliation. *See Strothers*, 2018 WL 3321317, at *11–*12.

"A plaintiff who establishes a prima facie case of retaliation bears the 'ultimate burden of persuading the court that [she] has been the victim of intentional [retaliation].' " *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 251–52 (4th Cir. 2015) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc)). "In order to carry this burden, a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.' " *Id.* (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

As noted above, Montgomery's work performance problems were legitimate grounds for termination, and she was only fired after repeated opportunities to bring her conduct into compliance with Medstar's standards. Montgomery attempts to rebut this record with contradictory and uncorroborated testimony that is insufficient to carry her burden. *See* ECF Nos. 29-2 (Montgomery Dep. at 79:15–81:12, 122:14–123:5) & 36-2 (Montgomery Dep. at 161:23–162:21). Simply put, without some evidence that Medstar's non-discriminatory reasons were pretextual, the retaliation claim cannot survive as a matter of law. *Foster*, 787 F.3d at 251–52; *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994); *Barwick v. Celtoex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issues of fact is to determine which of the two conlifcting versions of the plaintiff's testimony are correct."); *Robinson v. Baltimore City Police Dep't*, 181 F. Supp. 2d 470, 474 (D. Md. 2002). Accordingly, summary judgment as to Counts V-X is GRANTED.

A separate Order follows.

| 7/12/2018 | /s/ |
|---|---|
| Date | Paula Xinis |
| | United States District Judge |